**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

United States of America

       v.                              Case No. 19-cv-1113-PB
                                        Opinion No. 2022 DNH 135

Sheikh Enamur Rahman,
a/k/a Mohammed Enam

**MEMORANDUM AND ORDER**

The United States filed this civil action to denaturalize the defendant, Sheikh Enamur Rahman, pursuant to 8 U.S.C. § 1451(a). The government claims that Rahman's citizenship must be revoked because it was procured illegally and through willful misrepresentations. The government now moves for summary judgment. Because Rahman has not demonstrated that any fact material to the resolution of this matter remains in genuine dispute and the government has shown that it is entitled to prevail, I grant the government's motion.

## I.    BACKGROUND

In 1994, Rahman came to New York City from Bangladesh on a non-immigrant visa under his true name, Sheikh Enamur Rahman. Doc. 49-1 at 1. He quickly realized that he enjoyed being in the United States and wished to remain longer. Doc. 49-3 at 8. Rahman engaged the services of then-attorney Sheldon Walker in hopes of securing a work authorization. Id. at 2.

Upon arriving at Walker's office, Rahman was able to communicate with one of Walker's employees in his native tongue, Bengali. Doc. 49-1 at 1-2. The employee handed Rahman blank forms and told him to sign them, assuring Rahman it was standard procedure for procuring a work authorization. Id. at 2. The employee instructed Rahman to sign the forms using a "different name, a name in English that would be easy to write." Id. The employee recommended the name "Mohammed Enam," and Rahman signed the forms "Enam." Id.; Doc. 45-1 at 105. Although Rahman believed the forms were a request for work authorization, they were in fact an application for asylum (Form I-589). Id.; Doc. 49-3 at 19.

The employee told Rahman he would next need to procure a passport under the name Mohammed Enam. Doc. 49-1 at 3. To do so, the employee instructed Rahman to contact the Bangladeshi consulate in New York City, identify himself as Mohammed Enam, and state that he had lost his passport. Id. Although Rahman had not lost his passport, he followed the employee's instructions and successfully obtained a Bangladeshi passport under the name Mohammed Enam. Doc. 45-2 at 93-94. Rahman subsequently obtained a New York State driver's license, a New York City taxi license, a social security number, and a work authorization card, all under the name Mohammed Enam. Doc. 45-1 at 16-17, 64-65.

Walker's office filled out the remainder of Rahman's asylum application, Form I-589, without any further input or review from Rahman, falsely claiming that he was seeking asylum to avoid political persecution. Id. at 102-103; Doc. 49-1 at 2. Besides the false name, the form misrepresented Rahman's dates of birth and arrival in the United States, and it made no reference to his true name. Doc. 45-1 at 61-62, 101-106. Walker submitted the completed Form I-589 to the U.S. Immigration and Naturalization Service ("INS"), along with Rahman's new passport. Id. at 105; Doc. 45-2 at 92-95. Rahman was then assigned an "A-number"[1] under the name Mohammed Enam. Doc. 45-2 at 109.

Rahman was later interviewed by an INS officer in connection with his asylum application. Doc. 49-1 at 3. In the presence of the officer, Rahman signed the Form I-589 as "Enam," affirming that he "kn[ew] the contents of th[e] application" and "that they [were] true to the best of [his] knowledge." Doc. 45-1 at 30, 164. The officer concluded that Rahman was not credible based on material inconsistencies between his Form I-589 and statements he made during his interview. Id. at 132. Accordingly, the INS referred the

---

[1]     An "A-number" is a unique identifier assigned by the INS to noncitizens applying for status. See Koszelnik v. Sec'y of Dep't of Homeland Sec., 828 F.3d 175, 178 n.3 (3d Cir. 2016).

matter to the New York Immigration Court and issued an Order to Show
Cause charging Rahman with deportability. Id. at 130, 135-137. Although
Rahman does not recall being served with the Order to Show Cause, he
admitted that his signature appears on a portion of the document
acknowledging that it was personally served on him. Doc. 49-1 at 3; Doc. 51-2
at 8-9; Doc. 45-1 at 136.

On September 8, 1997, Rahman appeared in Immigration Court with a
new attorney, Victor Veloso. Doc. 45-1 at 143. Attorney Veloso was
substituting for Walker, who by that time had been indicted for filing over
5,000 fraudulent immigration applications. Doc. 49-1 at 4; see also United
States v. Walker, No. 96-cr-736 (HB), 1997 WL 327093 (S.D.N.Y. June 12,
1997). At the hearing, Attorney Veloso withdrew Rahman's request for
asylum and requested voluntary departure. Doc. 45-1 at 145. The
Immigration Judge granted Rahman's request, with an alternative order for
deportation that would become final should Rahman fail to depart the United
States by March 9, 1998. Id. at 150, 157. Using a Bengali interpreter,
Rahman confirmed that he understood the judge's order and would
voluntarily depart the United States, although he now claims that he only
made these statements pursuant to Attorney Veloso's instructions and did
not understand their relevance. Id. at 146, 150; Doc. 49-1 at 4.

Following the hearing, Attorney Veloso explained to Rahman that withdrawing his application for asylum rendered it without effect. Doc. 49-1 at 4. As such, Rahman could "go on [his] way" and "did not have to worry about deportation." Id. Rahman did not understand, nor did Attorney Veloso inform him, that he was required to leave the country and would be subject to deportation if he remained. Id.

Rahman did not leave the country, but rather moved to Atlanta, Georgia. Doc. 45-1 at 64. Consequently, Rahman became subject to a final deportation order on March 9, 1998. Id. at 157. Rahman claims that he never received notice of that order and did not become aware of its existence until the present litigation began. Doc. 49-1 at 4.

While in Atlanta, Rahman continued to occasionally go by Mohammed Enam, but he obtained a Georgia driver's license under his true name. Doc. 45-1 at 17-18, 170. Rahman eventually married and also obtained a marriage certificate under his true name. Doc. 45-2 at 100.

Rahman's wife, a United States citizen, contacted Attorney Teri Simmons to request assistance on Rahman's behalf. Id. at 2. Attorney Simmons asked Rahman and his wife to fill out intake paperwork, including a copy of a Form G-325A, which is a biographic information form submitted alongside an application for permanent residence. Id. at 19-22. Rahman

completed the forms himself, with the exception of a section on one of the intake forms that requested his employment history. Doc. 49-1 at 6. In filling out the Form G-325A, Rahman left blank a section that requested disclosure of "all other names used." Doc. 45-2 at 54.

Upon meeting, Rahman showed Attorney Simmons his New York driver's license under the name Mohammed Enam and explained that he had previously filed an application for asylum under that name. Doc. 49-1 at 5. Attorney Simmons told Rahman that he "should not refer to [his] use of the name Mohammed Enam." Id. Rather, Attorney Simmons stated that she would use Rahman's true identity to adjust his status to that of a permanent resident based on his marriage to a United States citizen. Doc. 49-5 at 12. When discussing the relevant paperwork, Attorney Simmons advised Rahman "[n]ot to list" his prior use of the Mohammed Enam identity in response to "the question of whether or not he ever used any other names." Id. at 13. She then prepared an application for permanent residence (Form I-485) and a biographic information form (Form G-325A) using the information Rahman and his wife had provided on the intake paperwork. Doc. 45-1 at 121; Doc. 45-2 at 23-24, 61, 66. These forms requested disclosure of "all other names used," "social security #" and "A # (if any)." Doc. 45-2 at 58, 66. Rahman's form stated "none" in response to each question, thereby omitting

his prior use of the Mohammed Enam identity and its attendant social security number and A-number. See id.

Attorney Simmons asked Rahman to review the completed forms and let her know of any changes that should be made. Id. at 56. Rahman did not review the forms in their entirety, but he nonetheless signed both forms "under penalty of perjury" and returned them to Attorney Simmons for submission. Doc. 49-1 at 7; Doc. 45-2 at 61, 66. Rahman was interviewed by a U.S. Citizenship and Immigration Services (USCIS)[2] officer in connection with his application, although he claims that he was not placed under oath during the interview or asked questions about his answers on the forms. Doc. 49-1 at 7. Rahman was subsequently granted legal permanent residence on January 17, 2004. Doc. 45-2 at 58.

Approximately two years later, Rahman contacted Attorney Kermit Zerr for assistance in applying for naturalization. Doc. 51-3 at 2. Pursuant to Attorney Simmons' advice, Rahman did not inform Attorney Zerr about his prior use of the Mohammed Enam identity or his application for asylum. Doc. 49-1 at 7. Attorney Zerr prepared an application for naturalization (Form N-

---

[2]     In March 2003, the Department of Homeland Security absorbed the INS and changed its name to USCIS. See Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002).

400) on Rahman's behalf using his true name. Doc. 45-2 at 89. The form stated: "If you have ever used other names, provide them below," to which Rahman responded "N/A," which he understood at the time to mean "not applicable." Doc. 45-2 at 80; Doc. 45-1 at 52. Additionally, the form asked if Rahman had (1) "ever given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion or removal;" (2) "ever been ordered to be removed, excluded or deported from the United States;" or (3) "ever applied for any kind of relief from removal, exclusion or deportation." Doc. 45-2 at 87-88. Rahman responded "no" to each question and signed the form "under penalty of perjury." Id. at 87-89.

A USCIS officer interviewed Rahman in connection with his Form N-400. Doc. 49-1 at 8. Although Rahman acknowledges that he was placed under oath at some point during the interview, he is unsure whether he was placed under oath at the beginning of the interview. Id. Regardless, Rahman claims that the interviewer did not ask him questions about his Form N-400, but rather tested his English language skills and knowledge of the United States government. Id. At the conclusion of the interview, Rahman signed his Form N-400 in the presence of the USCIS officer, affirming that he was aware of the contents of the form and that the information therein was "true

and correct to the best of [his] knowledge and belief." Doc. 45-2 at 89, 122-123. Rahman's application was approved, and he became a naturalized citizen on March 16, 2007. Doc. 45-2 at 91. He currently resides in New Hampshire with his son and has, by all accounts, remained a citizen in good standing since his naturalization. Doc. 49-1 at 9.

On October 26, 2019, the United States filed a five-count complaint to revoke Rahman's naturalization pursuant to 8 U.S.C. § 1451(a). Doc. 1 at 13-22. Each of the government's five counts advances a different theory as to why Rahman's naturalization must be revoked. One count, Count V, alleges that Rahman's naturalization was procured through willful misrepresentations on his Form N-400 and throughout his naturalization interview. Id. at 21-22. The remaining four counts allege that Rahman's naturalization was illegally procured. Id. at 13-21. Specifically, Counts I and II allege that his naturalization was unlawful because he cannot demonstrate that he had good moral character at the time he was seeking naturalization, as required by statute. Id. at 13-18. Count I alleges that his false testimony during his naturalization interview precludes him from establishing the requisite moral character, whereas Count II alleges that his misrepresentations on his Form N-400 and during his naturalization interview preclude him from establishing the requisite moral character. Id.

Counts III and IV allege that Rahman's naturalization was unlawful because he was not lawfully admitted as a permanent resident—a prerequisite to naturalization. Id. at 19-21. Count III alleges that Rahman was inadmissible, and therefore ineligible for permanent residence, because he misrepresented material facts on his Form I-485 and accompanying Form G-325A. Id. at 19-20. Count IV alleges that the grant of permanent residence was invalid because the USCIS lacked jurisdiction to adjust Rahman's status given that he was subject to an unexecuted deportation order. Id. at 20-21. The government now moves for summary judgment on all five counts. Doc. 45 at 1.

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the nonmovant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016). In this context, a "material fact" is one that has the "potential to affect the outcome of the suit." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). A "genuine dispute" exists if a factfinder could resolve the disputed fact in the nonmovant's favor. Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018).

The movant bears the initial burden of presenting evidence that "it believes demonstrates the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); accord Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018). Once the movant has properly presented such evidence, the burden shifts to the nonmovant to designate "specific facts showing that there is a genuine issue for trial," Celotex, 477 U.S. at 324, and to "demonstrate that a trier of fact could reasonably resolve that issue in [his] favor." Irobe, 890 F.3d at 377 (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)). If the nonmovant fails to adduce such evidence on which a reasonable factfinder could base a favorable verdict, the motion must be granted. Celotex, 477 U.S. at 324. In considering the evidence, the court must draw all reasonable inferences in the nonmoving party's favor. Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

### III.   ANALYSIS

The government argues that it is entitled to summary judgment on all five counts because Rahman willfully made several material misrepresentations on his applications for permanent residency and naturalization, most notably concerning his prior use of the Mohammed Enam identity. Rahman objects, arguing that his misrepresentations were

not willful because he made them on advice of counsel. Although the government seeks summary judgment on all five counts, it is entitled to an order of denaturalization if it succeeds on any one of the counts. I conclude that the government is entitled to summary judgment on Counts IV (illegal procurement of naturalization due to lack of jurisdiction), III (illegal procurement of naturalization due to willful misrepresentation of a material fact on an application for permanent residence), and V (procurement of naturalization through willful misrepresentation).

To revoke a naturalized individual's citizenship, the government must demonstrate that the order of naturalization was either (1) "illegally procured" or (2) "procured by concealment of a material fact or willful misrepresentation." 8 U.S.C. § 1451(a); see also Fedorenko v. United States, 449 U.S. 490, 505-506 (1981). "The Government carries a heavy burden of proof," Costello v. United States, 365 U.S. 265, 269 (1961), and must prove its case by "clear, unequivocal, and convincing" evidence that does "not leave 'the issue in doubt.'" Fedorenko, 449 U.S. at 505 (quoting Schneiderman v. United States, 320 U.S. 118, 125 (1943)). "This burden is substantially identical with that required in criminal cases—proof beyond a reasonable doubt." United States v. Mensah, 737 F.3d 789, 809 (1st Cir. 2013) (quoting Klapprott v. United States, 335 U.S. 601, 612 (1949)).

Particularly where, as here, "the attack is made long after the time when the certificate of citizenship was granted and the citizen has meanwhile met his obligations and committed no act of lawlessness," the court must "scrutinize the record with the utmost care." Nowak v. United States, 356 U.S. 660, 663 (1958) (quoting Schneiderman, 320 U.S. at 158). If, after careful review, it is determined that the government has satisfied its burden, the court is required to enter a judgment of denaturalization and enjoys no discretion in the matter. Fedorenko, 449 U.S. at 517.

## A.    Illegal Procurement of Naturalization – Lack of Jurisdiction (Count IV)

A certificate of naturalization is illegally procured, and therefore subject to revocation, if the applicant failed to strictly comply with all congressionally imposed prerequisites to naturalization. Fedorenko, 449 U.S. at 506. One such prerequisite is that the applicant must have been lawfully admitted as a permanent resident. See 8 U.S.C. § 1427(a). An applicant is not lawfully admitted if, at the time USCIS adjusted his or her status, it lacked jurisdiction to do so. See Koszelnik, 828 F.3d at 180.

Once an applicant is placed in deportation or removal proceedings, only the Immigration Judge presiding over those proceedings has authority to grant adjustment of status. See 8 C.F.R. § 1245.2 (2004) ("After an alien . . . is in deportation or removal proceedings, his or her application for

adjustment of status . . . shall be made and considered only in those proceedings"). Accordingly, USCIS lacks jurisdiction to adjust an applicant's status once deportation or removal proceedings have commenced. See Chan v. Lynch, 843 F.3d 539, 544 (1st. Cir. 2016). Removal proceedings commence, and jurisdiction vests in the Immigration Court, upon the filing of "charging documents," including an Order to Show Cause. 8 C.F.R. §§ 3.13, 3.14(a) (1997) (currently codified at 8 C.F.R. §§ 1003.13 and 1003.14(a), respectively).

The government contends that USCIS lacked jurisdiction to grant Rahman permanent residence because he was in removal proceedings at the time. To supports its contention, the government produced an affidavit from a USCIS official stating that, when Rahman applied for permanent residence, he was subject to an unexecuted order of deportation stemming from his withdrawn application for asylum. Thus, because Rahman had been placed in removal proceedings, only the Immigration Court could adjust his status to that of a permanent resident.

Rahman counters that the government is not entitled to summary judgment for two reasons. First, Rahman states that he does not recall being served with the Order to Show Cause, which he argues must occur before jurisdiction can vest in the Immigration Court. He asserts that this presents a genuine dispute as to whether jurisdiction properly vested in the

Immigration Court so as to deprive USCIS of jurisdiction. Second, Rahman contends that USCIS could have properly adjusted his status if the removal proceedings had been terminated by the Immigration Court, which the government has not demonstrated did not occur. I conclude that Rahman's defenses are without merit, and the government is entitled to summary judgment on Count IV.

Rahman's lack of recollection about being served with the Order to Show Cause does not create a genuine dispute of material fact, and therefore does not preclude summary judgment. Although Rahman stated that he does "not recall being served" with the Order, Doc. 49-1 at 3, he does not deny that he was served.  To the contrary, he admits that the signature on the Order's Certificate of Service, attesting that he received service of the Order before his hearing, is his own.

Mere lack of recall about a particular event, without more, does not create a genuine dispute as to whether the event actually occurred. See I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc., 182 F.3d 51, 55 (1st Cir. 1999) (noting that a witness's "mere lack of recollection" as to whether she received a document "does not suffice to create an issue of fact over whether or not she received [that document]" for the purposes of summary judgment); see also To v. U.S. Bancorp, 651 F.3d 888, 892 n.2 (8th Cir. 2011) ("An assertion that a

party does not recall an event does not itself create a question of material fact about whether the event did, in fact, occur."). This is particularly so where, as here, the undisputed evidence indicates that the relevant event did, in fact, occur. See E.E.O.C. v. Bob Evans Farms, LLC, 275 F. Supp.3d 635, 642 n.6 (W.D. Pa. 2017) (collecting cases and noting that "[a] failure to recall an event without a denial that it happened coupled with affirmative evidence that the event happened, is insufficient to create an issue of material fact preventing summary judgment").

Rahman's second defense—that the government has not sufficiently demonstrated that the removal proceedings were ongoing—fares no better. The undisputed evidence shows that Rahman was subject to an outstanding order of deportation when his status was adjusted to that of a permanent resident. This evidence supports the conclusion that Rahman was in removal proceedings and that, therefore, USCIS lacked jurisdiction to adjudicate his application for adjustment of status. See Dar-Salameh v. Gonzales, 468 F.3d 47, 51 (1st Cir. 2006) (concluding that USCIS lacked jurisdiction to adjust the status of a defendant who was subject to a decade-old order of deportation because "attempts to adjust his status occurred after he was placed in deportation proceedings and were not made within those proceedings"). Indeed, multiple courts have concluded that the existence of an outstanding

order of deportation is sufficient to deprive USCIS of jurisdiction. See, e.g., Koszelnik, 828 F.3d at 180 ("Since [the defendant] had a final order of deportation pending against him, INS lacked jurisdiction[.]"); Gonzalez v. Mayorkas, No. 1:13-cv-1230, 2014 WL 585863 at *5 (E.D. Va. Feb. 12, 2014) (concluding that an outstanding order of removal "deprieve[d] USCIS of any power or authority to adjudicate petitioner's adjustment application"); Nasr v. Hogan, No. 4:08-cv-415, 2008 WL 2310940, at *3 (M.D. Pa. June 3, 2008) (affirming USCIS decision that it lacked jurisdiction to adjust the status of a defendant "who was in removal proceedings but is now subject to a final administrative order of removal"); c.f., Wellington v. I.N.S., 108 F.3d 631, 635 (5th Cir. 1997) ("INS practice requires that aliens who have been found deportable in deportation proceedings seek adjustment of status through the mechanism of reopening their deportation proceedings."). Rahman has not cited any cases finding that USCIS retained jurisdiction in the face of an outstanding order of deportation, and I have found none. This is unsurprising, as "[m]isunderstandings can result if an alien successfully obtains a grant of adjustment of status and is simultaneously subject to a valid deportation order. Consolidating those actions into a single overall proceeding helps to avoid those misunderstandings." Dar-Salameh, 468 F.3d at 51.

Thus, the government has provided sufficient evidence that the removal proceedings were active when Rahman attained his adjustment of status. Although Rahman contends that the Immigration Judge *might* have terminated the proceedings, he does not assert that this actually occurred, let alone supply evidence of as much. Sheer speculation, of course, is not enough to preclude summary judgment. Therefore, Rahman has not demonstrated that there is a genuine dispute of material fact as to whether he was in removal proceedings when USCIS adjusted his status to that of a permanent resident. Because there is no question that Rahman was in removal proceedings at the time, USCIS lacked jurisdiction to adjudicate his application as a matter of law. The government is therefore entitled to summary judgment on Count IV.

**B.    Illegal Procurement of Naturalization – Willful Misrepresentation of Material Fact (Count III)**

As stated before, naturalization is illegally procured if the applicant was not lawfully admitted as a permanent resident. See Fedorenko, 449 U.S. at 506; see also 8 U.S.C. § 1427(a). An applicant cannot be lawfully admitted if he was inadmissible at the time of adjustment. See 8 U.S.C. § 1255(a). An applicant is inadmissible if he sought to procure an immigration benefit through fraud or willful misrepresentation of a material fact. See 8 U.S.C. § 1182(a)(6)(C)(i).

Failure to disclose relevant information in response to a specific question on an application for permanent residence may be considered a disqualifying misrepresentation if the omission is willful and material. See Toribio-Chavez v. Holder, 611 F.3d 57, 63 (1st Cir. 2010). A misrepresentation is material if it "ha[s] a natural tendency to influence the [government's] decision[]." Id. (quoting Kungys v. United States, 485 U.S. 759, 767 (1988)) (cleaned up). This is satisfied where, for example, truthful information "would predictably have disclosed other facts relevant to [the applicant's] qualifications." See Kungys, 485 U.S. at 774. Finally, the "element of willfulness is satisfied by a finding that the misrepresentation was deliberate and voluntary." Toribio-Chavez, 611 F.3d at 63 (quoting Mwongera v. I.N.S., 187 F.3d 323, 330 (3d Cir. 1999)). "An intent to deceive is not necessary; rather, knowledge of the falsity is sufficient." Id.

The government asserts that Rahman was not lawfully admitted for permanent residence because he made material misrepresentations on his application forms. Specifically, the government notes that Rahman failed to disclose his prior use of the name Mohammed Enam, as well as the social security number and the A-number associated with that name. I conclude that the government has shown that Rahman willfully made a material

misrepresentation by failing to disclose his prior use of the name Mohammed Enam on his application for permanent residency.[3]

There is no question that Rahman's failure to disclose his past name constitutes a misrepresentation. It is demonstrably false for Rahman to represent that he did not use any other names when, by his own admission, he exclusively used the name Mohammed Enam for several years. Although Rahman states that he did not complete the form himself, he admits that he signed the form. This is sufficient to demonstrate that he made a misrepresentation. See Toribio-Chavez, 611 F.3d at 63.

Rahman's misrepresentation was material because it prevented the government from discovering potentially disqualifying information. The government submitted an affidavit from Emily Costa, a supervisor at USCIS, stating that, had Rahman answered truthfully, the government would have obtained and reviewed his immigration file under the name Mohammed Enam. Doc. 45-2 at 110. This file, Costa averred, would have revealed that Rahman was subject to an outstanding deportation order and made material misrepresentations on his application for asylum. Id. Rahman has not supplied any evidence to the contrary.

---

[3]     In light of this conclusion, I need not address the other alleged misrepresentations.

The information that would have been discovered but for Rahman's misrepresentation bears directly on his eligibility for permanent residency for at least two reasons. First, as I explained above, the outstanding order of deportation divested USCIS of jurisdiction to adjudicate Rahman's application. See 8 C.F.R. § 1245.2(a)(1). Second, Rahman's fraudulent asylum application may have rendered him inadmissible. See 8 U.S.C. § 1182(a)(6)(C)(i) (providing that applicants who seek to procure immigration benefits through willful misrepresentation of a material fact are inadmissible); see also United States v. Daifullah, 11 F.4th 888, 896 n.4 (8th Cir. 2021) (holding that defendant who previously filed an asylum application under a false identity was inadmissible and therefore had illegally procured his permanent residency). Because the information that would have been discovered is potentially, if not decidedly, disqualifying, Rahman's omission is material. See Koszelnik, 828 F.3d at 180 (quoting Matter of Kai Hin Hui, 15 I. & N. Dec 288, 289 (B.I.A. 1975)) ("A misrepresentation is material if it 'tends to shut off a line of inquiry which is relevant to the alien's eligibility and which might well have resulted in a proper determination that he be excluded.'").

Finally, the undisputed evidence demonstrates that Rahman's misrepresentation was willful. Although Rahman avers that he did not

review the application before signing it, he does not appear to dispute that he knew both that the application form called for disclosure of any previously used names and that his submitted application omitted all references to his use of the Mohammed Enam identity. Rather, the evidence offered by Rahman indicates that he was aware of this omission. For example, Rahman admits that he completed a "sample" Form G-325A as part of his intake paperwork for Attorney Simmons to use in preparing his application. The form that Rahman completed was identical to the form that is submitted when applying for adjustment of status. Thus, in filling out this paperwork, Rahman necessarily would have realized that the application for adjustment of status required disclosure of "all other names used." See Doc. 45-2 at 54. Additionally, Rahman has repeatedly asserted that he had conversations with Attorney Simmons about his use of the Mohammed Enam identity, and that she had advised him "not to bring [it] up" in his application. See Doc. 49-3 at 38. Rahman's former wife similarly stated that Attorney Simmons advised Rahman on filling out the paperwork and told him "[n]ot to list" the Mohammed Enam identity on his application. See Doc. 49-5 at 13. Therefore, Rahman was aware that his attorney intended to omit all references to the Mohammed Enam identity, despite the application's request for "all other names used." Finally, Rahman has consistently stated that, at the time he

submitted his application, he believed his answers were accurate. See Doc. 45-1 at 121 ("As of the time that [the application for permanent residence] was submitted, based on my understanding and the advice and instruction of my lawyers, I do not believe that there were corrections to be made."); Doc. 49-1 at 6 ("Based on the advice and instruction of Mr. Veloso and Ms. Simmons, I believed the content of the Form I-485 and G-325A were accurate and appropriate."). Indeed, Rahman's primary defense, discussed in more detail below, is that he believed the answers on the application were appropriate given the advice of counsel. Of course, Rahman could not have believed that the contents of his application were accurate or appropriate if he did not know what was in the application.

Accordingly, there is no genuine dispute that Rahman knew his final application for permanent residence did not disclose his use of the Mohammed Enam identity. Moreover, Rahman acknowledges that he was aware of his use of the Mohammed Enam identity at the time he submitted his application. Thus, unless his advice of counsel defense has merit, there can be no doubt that Rahman acted willfully because he submitted his application knowing that it contained false statements. See Toribio-Chavez, 611 F.3d at 63.

In sum, the undisputed evidence shows that Rahman willfully made material misrepresentations on his application for permanent residency. As a result, he was not lawfully admitted as a permanent resident and therefore he procured his naturalization illegally.

**C.   Procurement of Citizenship by Concealment of a Material Fact or Willful Misrepresentation (Count V)**

A certificate of naturalization must be revoked if it was procured through concealment or misrepresentation of a material fact. See 8 U.S.C. § 1451(a). To revoke citizenship on this basis, the government must prove that (1) the naturalized citizen misrepresented or concealed some fact, (2) the misrepresentation or concealment was willful, (3) the fact was material, and (4) the naturalized citizen procured his or her citizenship as a result of the misrepresentation or concealment. See Kungys, 485 U.S. at 767.

The first three elements mirror the elements required under Count III. "A misrepresentation is a statement of fact that is untrue or a failure to disclose a fact in response to a specific question." See United States v. Hirani, 824 F.3d 741, 748 (8th Cir. 2016) (quoting Shipley v. Ark. Blue Cross & Blue Shield, 333 F.3d 898, 904 (8th Cir. 2003)). Again, willfulness does not require proof that the defendant had an "intent to deceive," but only that the "misrepresentation was deliberate and voluntary." See Toribio-Chavez, 611

F.3d at 63.[4] A misrepresentation is material if it "had a natural tendency to influence the decisions" of the government, such as where a truthful answer "would predictably have disclosed other facts relevant to [the applicant's] qualifications." Kungys, 485 U.S. at 772.

The fourth and final element requires proof that the defendant "procured citizenship as a result of the misrepresentation or concealment." Id. at 767. Although the elements of materiality and procurement are related, they are nonetheless distinct, and "satisfaction of one does not necessarily mean satisfaction of the other." Mensah, 737 F.3d at 808 (quoting United States v. Latchin, 554 F.3d 709, 713-714 (7th Cir. 2009)). Once it is established that the misrepresentation was material, it is presumed that the misrepresentation procured the citizen's naturalization so long as the government (1) demonstrates that citizenship was "obtained as a result of the application process in which the misrepresentations or concealments were made," and (2) "produces evidence sufficient to raise a fair inference of

---

[4]     Although Toribio-Chavez discussed the standard for willful misrepresentations under 8 U.S.C. § 1182(a)(6)(C)(i), courts have regularly applied the same standard to willful misrepresentations under 8 U.S.C. § 1451(a). See, e.g., United States v. Ahmed, 735 F. App'x 863, 868 (6th Cir. 2018); United States v. Charles, 456 F. Supp.3d 268, 283 (D. Mass. 2020); United States v. Rubalcava Gonzales, 179 F. Supp.3d 917, 925 (E.D. Mo. 2016).

ineligibility." Id. (quoting Latchin, 554 F.3d at 713-714) "The standard is not whether the application would have been denied 'but for' the misrepresentation, but whether a court could fairly infer the applicant would have been ineligible." United States v. Charles, 456 F. Supp.3d 268, 285 (D. Mass. 2020) (citing Kungys, 485 U.S. at 809). The presumption of procurement can nonetheless be rebutted if the defendant shows "through a preponderance of the evidence, that the statutory requirement as to which the misrepresentation had a natural tendency to produce a favorable decision was in fact met." Kungys, 485 U.S. at 777. In other words, once the government establishes it is entitled to a presumption of procurement, the burden shifts to the defendant "to prove that he was in fact eligible." Latchin, 554 F.3d at 714.

The government contends that Rahman willfully made material misrepresentations on his Form N-400 and subsequent interview, which, individually and collectively, procured his naturalization. Although the government focuses on several misrepresentations, I conclude that the government has satisfied its burden at least with regard to Rahman's failure to disclose his prior use of the Mohammed Enam identity on his Form N-400.

The form stated: "If you have ever used other names, provide them below," to which Rahman responded "N/A." Doc. 45-2 at 78. Rahman stated

that "N/A" stands for "not applicable," and he acknowledged that he was aware of as much when he signed the form. See Doc. 45-1 at 52. This response, viewed in context, is tantamount to a claim that Rahman has not "ever used other names" which is, by Rahman's own admission, false. At the very least, the response omits reference to his prior use of the Mohammed Enam identity and therefore constitutes a misrepresentation.

That misrepresentation was willful. Although Rahman states that his attorney completed the Form N-400, he does not dispute that he signed it with knowledge of its contents. Indeed, Rahman seems to take responsibility for providing the answer "N/A." See Doc. 45-1 at 52 ("During filling out the information, following instructions from [Attorney Simmons] not to bring Mohammed Enam again, I thought it would be appropriate to put not applicable there."); Doc. 49-1 at 7 ("Based on what Attorney Simmons told me, I believed it would have been inappropriate to reference my past use of the Mohammed Enam name and I thought it was appropriate to state that use of other names was 'not applicable.'"). Moreover, by Rahman's own admission, he was aware of his use of the Mohammed Enam identity when he submitted the Form N-400. Doc. 45-1 at 66. Thus, there can be no dispute that the misrepresentation was willful. See Toribio-Chavez, 611 F.3d at 63

27

Rahman's misrepresentation was also material because a truthful answer would have led to the discovery of other disqualifying information. The government submitted an affidavit from Christina Salidzik, the USCIS officer who adjudicated Rahman's application for naturalization. Doc. 45-2 at 113, 119. Salidzik stated that, had she been aware of Rahman's use of the Mohammed Enam identity, she would have retrieved his immigration file under that name. Id. at 124. After reviewing the information in that file, she would have concluded that he was ineligible for naturalization because he was not lawfully admitted as a permanent resident. Id.

Rahman nonetheless contends that his use of the "N/A" response was not material because the government has not demonstrated "that use of an alias alone would led [sic] to the denial of citizenship, or would have led it to discover the withdrawn asylum application." Doc. 49 at 32. Rahman's argument, however, misconstrues both the law and the evidence. It is not the case that the government must prove that a truthful response would, in and of itself, disqualify the defendant; rather, it is sufficient that "'disclosure of the true facts would have led the government to make an inquiry that might have uncovered other facts' that might lead to denial of the application." See United States v. Wu, 711 F.3d 1, 30 (1st Cir. 2013) (quoting United States v. Fedorenko, 597 F.2d 946, 951 (5th Cir. 1979), aff'd, 449 U.S. 490 (1981)).

Furthermore, Salidzik's affidavit states that she would have located Rahman's asylum application and subsequent order of deportation but for his misrepresentation. Despite his protestations, Rahman has not offered any evidence to rebut Salidzik's averment. Accordingly, I accept her uncontroverted statements as true. See Statchen v. Palmer, 623 F.3d 15, 18 (1st Cir. 2010). Thus, because the government has demonstrated that truthful information would have led to the discovery of disqualifying information, it has satisfied the element of materiality.

Finally, the government has demonstrated that Rahman procured his citizenship as a result of his misrepresentation. It is, of course, undisputed that the Form N-400 in question resulted in Rahman's naturalization. Furthermore, it is fair to infer that, had Rahman disclosed his use of the Mohammed Enam identity, he would have been found ineligible. As I explained before, Rahman was not lawfully admitted as a permanent resident, both because he was inadmissible and because USCIS lacked jurisdiction to adjust his status. Accordingly, the government is entitled to a presumption that Rahman procured his citizenship as a result of the misrepresentations. See Hirani, 824 F.3d at 752 ("Because [the applicant's] material misrepresentations concealed his statutory ineligibility to naturalize, [he] procured his naturalization on the basis of those

misrepresentations"). Rahman is unable to rebut this presumption because, as discussed, he cannot establish that he was lawfully granted permanent residence. Therefore, the government has demonstrated that Rahman obtained his naturalization through willful misrepresentations.

## D.   Defenses

Rahman asserts three defenses which he claims demonstrate a lack of willfulness as to Counts III and V. None is sufficient to preclude the entry of summary judgment for the government.

First, Rahman asserts that he did not know that the relevant filings were signed under penalty of perjury. But a misstatement is willful if it was made voluntarily with knowledge of its falsity, regardless of whether the defendant was aware that it was made under penalty of perjury. See Toribio-Chavez, 611 F.3d at 63 (concluding that "knowledge of the falsity is sufficient" to demonstrate willfulness); see also United States v. Daifullah, No. 5:18-cv-00163-JM, 2020 WL 553667 at *4 (E.D. Ark. Feb. 3, 2020), aff'd, 11 F.4th 888 (8th Cir. 2021) (rejecting argument that misrepresentations on naturalization application were not willful because defendant did not understand that he was signing application under penalty of perjury). Accordingly, the government is not required to prove that the defendant was aware the misrepresentations were made under penalty of perjury.

Second, Rahman appears to contend that his language barrier caused him to misunderstand the relevant questions. The government disputes this, arguing that Rahman had sufficient language skills to understand the questions. But assuming Rahman had a language barrier, he does not provide any evidence to indicate that he misunderstood or misinterpreted the questions. Nor does he explain what he understood the questions to mean, or how this understanding led him to believe that his answers were truthful. To the contrary, Rahman filed an affidavit stating that, pursuant to the advice of counsel, he "did not think [he] was supposed to or should have stated Mohammed Enam" on the forms. Doc. 49-1 at 6-7. Thus, at bottom, Rahman's claim is that he understood the questions but believed that his responses were appropriate based on the advice of counsel.

But it is no defense that an attorney advised Rahman to refrain from referencing the Mohammed Enam identity. Good faith reliance on the advice of counsel may, in some circumstances, negate a finding that a misrepresentation was made willfully. See Boufford v. United States, 239 F.2d 841, 845-846 (1st Cir. 1956). Such a defense, however, is only available where the defendant "(i) fully disclosed all material facts to his attorney before seeking advice; and (ii) actually relied on his counsel's advice in the good faith belief that the conduct was legal." United States v. Rice, 449 F.3d

887, 892 (8th Cir. 2006) (cited with approval in Janiero v. Urological Surgery Pros. Ass'n, 457 F.3d 130, 140 (1st Cir. 2006)). An individual cannot, however, have a good faith belief that his conduct was legal where it was unambiguously unlawful. Therefore, the defense generally only succeeds where there is some ambiguity in what the law requires.

For example, in Boufford v. United States, the First Circuit held that a jury could reasonably conclude that a defendant did not willfully make a misrepresentation on his application for naturalization if they believed that he was acting pursuant to the advice of his counsel. 239 F.2d at 846. In that case, the naturalization application asked, "How many times have you ever been married?" Id. at 843. The defendant answered "once," referring to his first marriage, even though he had previously entered into a void second marriage while still married to his first wife. Id. The court concluded that a jury could have reasonably found that the defendant was relying on counsel's advice that the question was referring to "the legal state of wedlock, rather than to a void ceremony of marriage." Id. at 845. Thus, the jury could have reasonably found that the defendant believed that he was answering the question truthfully based on his attorney's advice, and therefore did not make a willful misrepresentation. Id.

The same could not be said here. Unlike the question at issue in
Boufford, there is no reasonable interpretation of the questions here that
would have led Rahman to believe that his responses were truthful, nor does
Rahman assert that his attorney offered any such interpretation. Ultimately,
Rahman was not relying on his attorney's interpretation of an ambiguous
question, but relying on his attorney's advice to lie. As a matter of law, a
defendant cannot rely in good faith on an attorney's recommendation to
commit perjury. See Williamson v. United States, 207 U.S. 425, 453 (1908)
("[N]o man can willfully and knowingly violate the law and excuse himself
from the consequences thereof by pleading that he followed the advice of
counsel."); see also United States v. Johnson, 730 F.2d 683, 687 n.3 (11th Cir.
1984) ("if [the defendants] had claimed that they relied on [their
accountant's] advice about lying about their criminal records, such a claim
would clearly be outside of the 'good faith' prong of the expert advice
defense"); United States v. Drame, No. 18-civ-11480 (AKH), 2021 WL
1226996 at *8 (S.D.N.Y. Apr. 1, 2021) (concluding that, in an action to revoke
citizenship based on material misrepresentations, a defendant cannot claim
good faith reliance on the advice of counsel where "he was counseled not to
follow the law and to lie"); S.E.C. v. Goldsworthy, No. 06-10012-JGD, 2008
WL 8901272 at *5 (D. Mass. June 11, 2008) (quoting United States v.

33

Erickson, 601 F.2d 296, 305 (7th Cir. 1979)) ("A claim of good faith reliance on the advice of accountants or counsel is not available where, notwithstanding the professional's advice, the defendant 'knowingly and willfully filed materially false and misleading financial statements'"). Therefore, Rahman has failed to provide any evidence to rebut the government's showing of willfulness.

## IV. CONCLUSION

For the foregoing reasons, the government's motion for summary judgment (Doc. 45) is granted as to Counts III, IV, and V. The remaining counts are dismissed as moot, and the clerk of court shall close the case. Judgment will be entered for the government as follow:

1) The Order of the United States District Court of New Hampshire, dated March 16, 2007, granting Rahman citizenship ("the Order") is vacated and Rahman's United States citizenship is revoked.

2) Rahman's Certificate of Naturalization No. 30151323 ("the Certificate"), issued pursuant to the Order, is canceled and void.

3) Rahman is permanently enjoined from claiming any rights, privileges, benefits, or advantages related to the Order.

4) Rahman shall surrender and deliver, within ten days of entry of judgment, the Certificate and all copies thereof in his possession, as well as

any other indicia of U.S. citizenship, including but not limited to any U.S.

passports and voter registration cards, to the Attorney General.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

October 25, 2022

cc:    Counsel of record